UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------x

WILSON & WILSON HOLDINGS LLC,

                        Plaintiff,

    v.

DTH, LLC, TOMER DICTUREL, and
RYAN HICKMAN,

                        Defendants.

-----------------------------------------------------x

Case No. 1:22-CV-02941-PGG

**JURY TRIAL DEMANDED**

## <u>FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Plaintiff, Wilson & Wilson Holdings LLC ("**Plaintiff**"), through undersigned counsel, files this First Amended Complaint against Defendants, DTH, LLC ("**DTH**"), Ryan Hickman ("**Mr. Hickman**") and Tomer Dicturel ("**Mr. Dicturel**") (collectively, "**Defendants**"), and alleges as follows:

### I.    <u>INTRODUCTION</u>

Plaintiff, an LLC consisting of a husband and wife team, purchased the assets of a business for $300,000. Contrary to the terms of the deal, the "business" that they received consisted of a non-functioning re-packaging of a platform owned by other entities. Defendants have stopped attempting to repair the issues with the broken platform and refuse to repay Plaintiff's investment. This is an action to hold Defendants accountable for the sale of ultimately worthless assets.

Plaintiff, through its two members, Melissa and Michael Wilson (the "**Wilsons**"), entered into negotiations with Mr. Dicturel and Mr. Hickman for the sale and purchase of Investor Intelligence, an existing business that provided for the matching of investors with businesses or issuers of securities ("**Investor Intelligence**"). At the time of the parties' negotiations and due

1

diligence period, Investor Intelligence was operating as a successful platform and was generating between $10,000-30,000 per month in revenue. In reality, without Plaintiff's knowledge, what Mr. Dicturel and Mr. Hickman were demonstrating to Plaintiff was a different version of the platform that was created for another company. Ultimately, Plaintiff agreed to purchase Investor Intelligence and paid Defendant $300,000 based on the representations and assurances of Mr. Dicturel and Mr. Hickman as to Investor Intelligence's existing revenue stream, functionality, and capabilities.

Following the execution of the agreement, instead of transferring the fully functioning, revenue-generating platform Defendants demonstrated during negotiations and the due diligence period, Mr. Hickman attempted to re-engineer or re-package the software, which actually belonged to another entity, but he was unsuccessful. As a result, the Investor Intelligence platform that Plaintiff received was inoperable for its intended use. Nonetheless, for nearly one year, Plaintiff relied on Mr. Dicturel's and Mr. Hickman's representations that they would repair the Investor Intelligence platform, which only Mr. Hickman, its creator, had the requisite knowledge to do. In the hope that Plaintiff would eventually receive what it paid for, Plaintiff worked diligently and patiently with Mr. Dicturel and Mr. Hickman, who acknowledged that DTH did not transfer what was agreed to in the asset purchase agreement. Now, approximately two years later, Plaintiff still has not received what it paid $300,000 for—*i.e.*, a fully functioning Investor Intelligence platform that provides matchmaking technology to match businesses with investors from an existing database of over 100,000 investors, together with numerous other assets and capabilities included in the asset purchase agreement, and an established business revenue stream of approximately $10,000-$30,000 per month.

Additionally, at all relevant times, instead of remedying the defects to the Investor Intelligence platform caused by Defendants, Defendants were developing, managing, owning, or operating businesses that compete with Investor Intelligence (or would be competing if Investor Intelligence was operable), despite the existence of a restrictive covenant agreement. In fact, even post-closing, Defendants appeared to be profiting from the Investor Intelligence website through links that directed subscribers to engage in business with Defendants.

Due to the wrongful actions of Defendants, Plaintiff has suffered financial hardship, including the loss of $300,000 for a defunct platform, lost profits, lost income, and various other significant damages.

## II. PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff is a Delaware limited liability company, with its principal place of business located at 305 Spider Lily Lane, Naples, Florida 34119. Plaintiff has only two members, Melissa Wilson and Michael Wilson. The Wilsons are domiciled in Naples, Florida.

2.      DTH, LLC is a Delaware limited liability company, with its principal place of business located at 84 Newcomb Rd., Tenafly, NJ 07670.

3.      Upon information and belief, DTH has only two members, Mr. Dicturel and Mr. Hickman.

4.      Mr. Dicturel is a United States citizen domiciled in New Jersey and residing in Tenafly, New Jersey.

5.      Mr. Hickman is a United States citizen domiciled in Nevada and residing in Henderson, Nevada.

6.     This court has original jurisdiction of this civil action pursuant to 28 U.S.C. § 1332(a) because complete diversity of citizenship exists between Plaintiff and Defendants, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

7.     Venue is proper in this District because the agreements executed by the parties and subject of this action contain a governing law provision, pursuant to which the parties have agreed that the exclusive jurisdiction and venue shall be the state and federal courts located in New York County, New York.

### III.     GENERAL ALLEGATIONS

### A. BACKGROUND

8.     At all relevant times, Defendants were engaged in the business of software development through which they developed a software platform named Investor Intelligence, which provides for the matching of investors with businesses or issuers of securities.

9.     Mr. Hickman is the developer and creator of Investor Intelligence.

10.     Mr. Dicturel was, at all relevant times, Defendant's CEO, Mr. Hickman's business partner, and had a central role in developing and marketing Investor Intelligence.

11.     In 2020, Plaintiff, Mr. Dicturel, and Mr. Hickman engaged in negotiations for the sale and purchase of Investor Intelligence, together with its assets, software, and functionalities.

12.     During the negotiations, Investor Intelligence was an existing business with a revenue stream of approximately $10,000-$30,000 per month.

13.     In July 20, 2020, Mr. Dicturel made detailed representations to Plaintiff about the capabilities and functionalities of Investor Intelligence, representations which were later memorialized in the APA:

On Jul 20, 2020, at 11:55 AM, Tomer Dicturel <tomer@epic.ai> wrote:

How is 11:30AM or end of day 5pm ?

Here is the email from Ryan I sent few weeks ago ( I might be going to your spam )

All of our AI systems live within the application itself. One of the main use cases is leveraging NLP to contextualize relevance based on an investors bio. This helps fine tune who specifically would be a good fit for a deal.

In addition to the NLP tagging, we also have a recommendation engine. The built in recommendation engine makes low level suggestions of other investors based on investors who exhibit similar behavior or who have invested in high affinity deals.

Lastly, we have a real time feedback ranking ml-based system. This system serves two purpose, the main of which is to promote investors who engagement in feedback, deck review and pitch email. This puts the active community at the front of outreach creating more success for our users. We also use this system for send time optimization, prevent too many emails going to the same investors in a short period repeatedly, along with shipping emails when it's best fit (e.g. not on weekends, not late nights, etc.) We use historic data to drive this.

Tomer Dicturel
Founding Partner
m: 646-996-2049   https://meetings.hubspot.com/tomer10 [meetings.hubspot.com]
Epic.Ai [epic.ai] - The Startup Success Platform

 EpicAI

[e.customeriomail.com]

14.     During the due diligence period, Plaintiff was concerned about future maintenance and repairs to Investor Intelligence that might become necessary because only Mr. Hickman, as the creator and developer of Investor Intelligence, had the requisite specialized knowledge to make revisions to the Investor Intelligence Assets.

15.     On October 16, 2020, Mr. Dicturel assured Plaintiff that if Mr. Dicturel and Mr. Hickman are unavailable to provide maintenance or repairs for Investor Intelligence, Plaintiff would only "take 2-3 weeks setback until someone else gets familiar with [the] [source] code:"

**From:** Tomer Dicturel
**Sent:** Friday, October 16, 2020 10:46 PM
**To:** Melissa Wilson
**Subject:** Re: REVISED TPA

Yes it came as result of removing escrow I jus saw it and don't like it - I agree with you !
There is no need for you just to buff a it the one sentace you added 7.2
ignor it don't sent to lawyer .
If I am gone you good if Ryan gone you take 2-3 weeks setback until someone else gets familiar with code ! Work is done

Errors courtesy of auto correct
iPhone

## B.  THE TECHNOLOGY ASSETS PURCHASE AGREEMENT

16.     Based on Mr. Hickman's and Mr. Dicturel's representations and assurances, including as to the existing functionality, capabilities, and revenue stream of Investor Intelligence, Plaintiff agreed to purchase Investor Intelligence.

17.     Plaintiff reasonably and justifiably relied on Mr. Hickman's and Mr. Dicturel's representations, particularly given that Mr. Hickman was the creator and developer of Investor Intelligence and Mr. Dicturel had a central role in its marketing and operation.

18.     On October 22, 2020, Plaintiff and DTH executed a Technology Assets Purchase Agreement ("**APA**"), pursuant to which Plaintiff agreed to pay DTH $500,000 ("**Purchase Price**") for the Investor Intelligence platform, including certain assigned properties, assigned rights, and deliverables (collectively, the "**Investor Intelligence Assets**"). A true and correct copy of the APA is attached as **Exhibit 1.**

19.     Mr. Dicturel executed the APA on behalf of DTH as DTH's CEO.

20.     Section 2.2 of the APA provides that Plaintiff was obligated to pay the Purchase Price in two parts: (1) an initial cash payment of $300,000 ("**Initial Payment**") to be paid simultaneously with the execution of the APA; and (2) $200,000 to be paid as follows: each month during which gross revenue from Investor Intelligence exceeds $15,000, the entire gross revenue amount over $15,000 to be paid to DTH until the $200,000 has been fully paid.

21.     Upon execution of the APA, Plaintiff made the Initial Payment of $300,000 to DTH.

22.     During negotiations and in the APA, Mr. Dicturel and Mr. Hickman represented to Plaintiff that the Investor Intelligence Assets include:

a. Artificial intelligence and natural language programming to read and contextualize investor biographies for matchmaking and recommendations;

b. The ability to make recommendations based on regression analysis of sent emails;

c. The ability to make recommendations based on user opens, or "clicks," on a particular deal;

d. The ability to optimize timing of emails to investors;

e. Access to a database of over 100,000 investors;

f. The ability to review and modify the investor database;

g. An investor database that was backed up in real time;

h. Certain user data and customer leads;

i. Investor profiles enriched with valid email addresses;

j. The ability to make investor recommendations;

k. Artificial intelligence-based campaign enrichment;

l. The ability to create "CRM Tasks" in connection with associating investors to fundraising campaigns;

m. A CustomerIO account;

n. Certain investor search field functionalities; and

o. Email sequencing capabilities.

*See* Ex. 1, p. 13-21.

23. Pursuant to the APA, DTH agreed to sell and Plaintiff purchased certain Assigned Properties in connection with the Investor Intelligence Assets to include: "(i) the Software, (ii) Technology, (iii) Source Code, (iv) the Assigned Domain Names, (v) the Assigned Copyrights,

(vi) the Databases, (vii) the Assigned Trade Secrets, (viii) the Documentation, and (ix) existing revenue streams from any and all of the foregoing." (Ex. 1, §§ 1, 2.1).

24.     Section 2.3 of the APA provides that: "[DTH] shall, upon [Plaintiff's] written request and at [Plaintiff's] expense, take any and all reasonable and permissible action and execute, acknowledge and deliver to [Plaintiff] any and all further instruments and assurances necessary or expedient in order to fully vest in [Plaintiff] the Assigned Properties and Assigned Rights and to facilitate [Plaintiff's] enjoyment, defense and enforcement thereof.

25.     Section 2.4 of the APA provides that "[DTH] shall promptly deliver to [Plaintiff] all manifestations of the Assigned Properties (including all copies thereof) in [DHT's] possession or control . . . ."

26.     Section 3.2 of the APA includes certain warranties with respect to the Investor Intelligence Assets, which provide, in part:

> 3.2 Content and Performance Warranty. [DTH] further represents and warrants to [Plaintiff] that as of the Effective Date:
>
> a)  the Software is fully operable, meets all applicable specifications, and functions in all respects, in conformity with the Documentation;
>
> b)  The Documentation is accurate in all respects such that the Software does not have any material undocumented feature;
>
> c)  all media on which the Software or Documentation is delivered to [Plaintiff] are free of any damage or defect in design, material, or workmanship, and will remain so under ordinary use as contemplated by (i) this Agreement, and with respect to the Software, (ii) the Documentation . . . .

27.     Section 5.1 of the APA provides:

> 5.1 Indemnity by [DTH]. [DTH] shall indemnify and hold [Plaintiff] . . . harmless from and against any and all claims, demands of any kind whatsoever, suits, losses, damages, liabilities, costs and expenses (including the cost of investing any claim and reasonable attorneys' fees and court costs), (i) arising from [DTH's] breach of

any of [DTH's] representations and warranties set forth in Section 3 above . . . .

28. Concurrent with the execution of the APA, Plaintiff and DTH also executed a Transition Services Agreement, pursuant to which Mr. Dicturel and Mr. Hickman were obligated to provide certain transition services to Plaintiff in connection with Investor Intelligence.

## C. THE RESTRICTIVE COVENANT AGREEMENT

29. On October 22, 2020, concurrent with the execution of the APA, Plaintiff and DTH executed a Restrictive Covenant Agreement ("**Restrictive Covenant**"). A true and correct copy of the Restrictive Covenant is attached as **Exhibit 2**.

30. Section 2(a) of the Restrictive Covenant provides:

Without the agreement of [DTH] to be bound by the provisions of this Section 2, [Plaintiff] would not have paid the Purchase Price or entered into or consummated the transactions contemplated by this Agreement. Therefore, as an inducement to [Plaintiff] to enter into this Agreement and the Purchase Agreement and to complete the transactions contemplated hereby, [DTH] covenants and agrees as follows . . . .

31. Section 2(a)(i) of the Restrictive Covenant provides:

[S]o long as (i) [Plaintiff] remains the owner of the Assigned Properties and the Intellectual Property Rights related thereto, or (ii) for a period of two (2) years from the Closing Date, whichever is earlier…[DTH] shall not, directly or indirectly, own, operate, manage, or control any business that competes (a "Competing Business") with [Plaintiff] or its affiliates by assisting such Competing Business in building and/or creating a software application tool designed to connect sources of equity capital for equity capital financing projects with those parties seeking capital for a business or investment product….

32. Furthermore, Section 6 of the Restrictive Covenant provides: "[DTH] acknowledges and agrees that the protections and obligations set forth in this Agreement are a material condition to the consummation of the [APA]."

### D. **DEFENDANTS' BREACHES AND FAILURE TO DELIVER THE INVESTOR INTELLIGENCE ASSETS**

33.     Upon execution of the APA, Mr. Dicturel and Mr. Hickman represented to Plaintiff that delivery of the Investor Intelligence Assets would be completed within one week because Mr. Hickman was completing certain modifications to the software to make it more "user-friendly" by converting the "frontend" of the Investor Intelligence platform—what the user sees or interacts with when they visit a website—to a clean WordPress website.

34.     Again, relying on Mr. Hickman's representations and specialized knowledge of Investor Intelligence, Plaintiff expected to receive what was agreed upon in the APA.

35.     On or about October 29, 2020, Mr. Dicturel and Mr. Hickman conducted a virtual presentation for Plaintiff for purposes of demonstrating the assets and functionalities associated with Investor Intelligence.

36.     The October 29, 2020 presentation included a demonstration of what Mr. Dicturel and Mr. Hickman purported to be the "backend" of the platform, which includes the source code, database of investors, natural language programming, and other Investor Intelligence Assets.

37.     In the October 29, 2020 presentation, Mr. Dicturel and Mr. Hickman represented that the Investor Intelligence Assets include a multi-tenant experience, natural language querying, machine learning tools, drip sequencing, raw HTML unformatted email templates, and a customizable database.

38.     Despite representing that they were demonstrating the backend of Investor Intelligence to Plaintiff, Defendants refused to give Plaintiff access to the backend, even though under the APA, these assets belonged to Plaintiff.

39.     Post-closing, Plaintiff began learning that Defendants had failed to deliver various material assets.

40.     By way of example, Plaintiff learned that the functionality offered to existing subscribers of Investor Intelligence did not include what was marketed on the Investor Intelligence website.

41.     Since Defendants refused to give Plaintiff access to the Investor Intelligence backend, Plaintiff could not verify or remedy subscriber complaints, resulting in significant financial and reputational risk and harm to Plaintiff.

42.     In November 2020, while reviewing Google analytics of Investor Intelligence website usage, Plaintiff discovered that the Investor Intelligence website contained multiple links directing subscribers to schedule a meeting with Mr. Dicturel for revenue-based funding.

43.     In other words, the version of Investor Intelligence that Defendants delivered to Plaintiff, which was inoperable for its intended purpose, contained links created by Mr. Hickman whereby subscribers were re-directed to Mr. Dicturel for business opportunities, pursuant to which Mr. Dicturel could profit even after Plaintiff purchased Investor Intelligence.

44.     Furthermore, a Google analytics report for Investor Intelligence traffic from October 29, 2020 through March 31, 2021—*i.e.*, during Plaintiff's ownership of Investor Intelligence—shows scheduled meetings for various entities owned, managed, or operated by Mr. Dicturel and Mr. Hickman, including Motivus and Crane Software:



45.  By way of background, "events" refer to meetings scheduled through the links included on the Investor Intelligence website, links which direct visitors to communicate and meet with Mr. Dicturel and Mr. Hickman through their various entities.

46.  Thus, not only did Defendants fail to deliver to Plaintiff an operable, revenue-generating platform, but the defunct platform they did deliver included links to direct business away from Plaintiff to themselves or their entities.

47.  By February 2021, Defendants were still refusing to give Plaintiff access to the backend of the Investor Intelligence platform even though Plaintiff had purchased those assets approximately four months prior.

48.  Upon information and belief, Defendants refused to provide Plaintiff access to the backend of Investor Intelligence because those assets belonged to another entity, as evidenced by the WordPress URL pages connected to Investor Intelligence, which identified the name of another entity, a business known as Goldfingr.

49.     Goldfingr was marketed to provide services that were identical to those that Investor Intelligence should have been able to provide according to Defendants' representations and obligations under the APA, *i.e.*, matching deal flow with over 100,000 investors.

50.     Upon further investigation, Plaintiff discovered that the Investor Intelligence Assets contained various links and references to Goldfingr, a competing business that Mr. Dicturel and Mr. Hickman were, upon information and belief, developing, creating, and marketing software for.

51.     Upon further information and belief, the Investor Intelligence platform that Defendants presented to Plaintiff during negotiations, during the due diligence period, and on October 29, 2020, was created for and belonged to another entity.

52.     Instead of transferring the existing Investor Intelligence platform with an established revenue stream that was presented to Plaintiff before the execution of the APA and in the October 29, 2020 presentation, Mr. Hickman attempted to re-engineer and re-package the Investor Intelligence platform because he could not deliver to Plaintiff what belonged to another entity.

53.     Defendants did not inform Plaintiff before the execution of the APA that they were not transferring an existing platform with an established revenue stream, but that they would instead be attempting to re-engineer the platform for Plaintiff.

54.     Ultimately, Mr. Hickman was unable to re-engineer the Investor Intelligence platform that was presented to Plaintiff and that DTH was obligated to transfer to Plaintiff pursuant to the APA.

55.     Plaintiff would not have agreed to enter into the APA had it anticipated or known that Mr. Hickman's and Mr. Dicturel's representations regarding their ability to deliver the Investor Intelligence Assets were false or misleading.

56.     Nor would Plaintiff have entered into the APA had it anticipated or known that there would be an indefinite delay in the operation and marketing of Investor Intelligence as this would have a significant impact on revenue streams, reputational costs, and business generation.

57.     Defendants' wrongful actions ultimately rendered Plaintiff's version of Investor Intelligence useless for its intended purpose.

58.     Defendants failed to deliver numerous material Investor Intelligence Assets, capabilities, and functionalities, including but not limited to:

a) Matchmaking technology to curate multiple investor lists from a database of over 100,000 investors;

b) Documentation in connection with the work performed to the software by Defendants during Plaintiff's ownership of the Investor Intelligence Assets;

c) Documentation as to how to access and modify the databases;

d) Access to copies of databases;

e) CustomerIO account and certain user data and customer leads;

f) E-mail regression analysis;

g) Real-time, natural language and machine-learning based enrichment of investor biographies and contact details for database matchmaking and recommendations;

h) Drip campaign scheduling and email sequencing capabilities;

i) Creation of CRM tasks associating with fundraising;

j) Multi-tenant experience;

k) The ability to make recommendations based on user opens, or "clicks," on a particular deal;

l) The ability to optimize timing of emails to investors;

m) Investor databases that are backed up in real time;

n) Documentation on how to access, edit, and upload new investors; and

o) Certain investor search field functionalities.

59.     By way of example of Defendants' failures to deliver material Investor Intelligent Assets, Defendants failed to deliver an existing, operable account with CustomerIO, which is an automated marketing platform, and which the APA expressly identifies as an asset to be delivered to Plaintiff. (Ex. 1, p. 13).

60.     Instead of transferring to Plaintiff the existing CustomerIO account previously used by Defendants in their operation of Investor Intelligence, Defendants created a new account for Plaintiff and attempted to copy a database of customer records into the new account.

61.     Defendants' copying of the database resulted in CustomerIO suspending Plaintiff's account because CustomerIO believed the records were illegally obtained.

62.     CustomerIO sent Plaintiff numerous notices of their concerns in connection with the Investor Intelligence CustomerIO account.

63.     Mr. Hickman and Mr. Dicturel assured Plaintiff that they would resolve the concerns expressed by CustomerIO and that they were communicating with CustomerIO to prove that the customer records were legally obtained and to reactive Plaintiff's CustomerIO account.

64.     Mr. Hickman and Mr. Dicturel instructed Plaintiff not to contact CustomerIO because they were personally working with CustomerIO to resolve these issues, and further advised Plaintiff not to contact CustomerIO because it lacked the requisite information to reactivate the account.

65.     Subsequently, Plaintiff learned from a CustomerIO representative that Mr. Dicturel and Mr. Hickman had never spoken to anyone at CustomerIO about Plaintiff's account. A true and correct copy of Plaintiff's emails with CustomerIO, in which CustomerIO informs Plaintiff that it

is "unable to find a thread that speaks to a resolution of this compliance breach, nor any records that reference a re-activation of your account," is attached hereto as **Exhibit 3**.

66.     As a result, Plaintiff never received an operable CustomerIO account. Defendants' failure to comply with CustomerIO, CustomerIO deleted Plaintiff's account and all of its contents, which included customer records and marketing leads.

67.     Without customer records and marketing leads, Plaintiff was not able to engage with a database of organic prospective customers. Nor did Plaintiff have access to a list of customers who had unsubscribed from Investor Intelligence. Therefore, if Plaintiff had emailed a customer who unsubscribed from Investor Intelligence, pursuant to the CAN-SPAM Act, Plaintiff was at risk of incurring a penalty of up to $46,517 for each email sent.[1]

68.     The consequence of Defendants' failure to provide a CustomerIO account for Investor Intelligence resulted in a significant legal and financial risk to Plaintiff that would have prevented it from operating Investor Intelligence even if other assets and functionalities were delivered.

69.     Nonetheless, relying on Defendants' promises to eventually deliver, and having already made a large investment, Plaintiff undertook continuous efforts to communicate and cooperate with Defendants for nearly one year.

70.     Plaintiff participated in weekly meetings with Defendants, employed excel spreadsheets to monitor outstanding repairs that needed to be made, used written agendas, AirTable, and regularly communicated detailed concerns.

---

[1] https://www.ftc.gov/business-guidance/resources/can-spam-act-compliance-guide-business (last visited September 22, 2022).

71.     On January 21, 2021, Plaintiff emailed Mr. Dicturel and detailed numerous ongoing issues with the Investor Intelligence Assets and DTH's failure to deliver a finished, fully functioning product as contemplated by the APA. A true and correct copy of Plaintiff's January 21, 2021 email is attached hereto as **Exhibit 4**.

72.     On or about March 29, 2021, Plaintiff met with Mr. Dicturel and Mr. Hickman. During this meeting, Plaintiff informed Mr. Dicturel and Mr. Hickman of various ongoing issues, including but not limited to: (i) that Plaintiff still does not have access to the backend database; (ii) the "test email" functionality does not work; (iii) the list query functionality is not operating; and (iv) that Plaintiff was still experiencing problems with outbound email functionality and system time stamps.

73.     Each of the assets, functionalities, and capabilities that Plaintiff had not received by March 29, 2021 were either expressly contemplated by the APA or represented to be included in the Investor Intelligence Assets to induce Plaintiff's purchase.

74.     Plaintiff  also discovered that Defendants failed to a deliver the functionality to curate a list before sending an email—i.e., a multi-tenant functionality—the existence of which was material to Plaintiff and was represented by Defendants to be included in Investor Intelligence to induce its purchase.

75.     Despite these representations, which were discussed with Plaintiff before the execution of the APA and in promotional materials, on March 29, 2021, Mr. Hickman changed course and informed Plaintiff that the functionality to curate an email list was never included in the Investor Intelligent Assets.

76.     On or about March 30, 2021, Plaintiff again sent Mr. Dicturel an email detailing numerous continuing defects with the Investor Intelligence Assets, along with the resultant

damages suffered by Plaintiff due to the inability to generate revenue and damage to Plaintiff's reputation. A true and correct copy of Plaintiff's March 30, 2021 email is attached hereto as **Exhibit 5**.

77.     Plaintiff further demanded that Defendants take any and all necessary actions to deliver to Plaintiff the Investor Intelligence Assets that were agreed upon in the APA and that were critical to the ability to generate revenue. (Ex. 5).

78.     On or about March 31, 2021, Mr. Hickman responded to Plaintiff and stated that Defendants will be accountable for ensuring certain technical capabilities and that "[Defendants] are going to provide the specifics per the list of deliverables" contemplated by the APA. (Ex. 5).

79.     On or about March 31, 2021, Plaintiff emailed Mr. Hickman to inform him that it has still not received instructions or documentation as to how to access the investor database, a material component of the Investor Intelligence Assets purchased under the APA. A true and correct copy of Plaintiff's March 31, 2021 email is attached as **Exhibit 6**.

80.     On or about April 5, 2021, after Defendants' continued failure to deliver to Plaintiff the Investor Intelligence Assets, Plaintiff again sent an email to Mr. Hickman and Mr. Dicturel attempting to cooperate in good faith and to once again request that Defendants make any and all necessary repairs and take all necessary actions to deliver the Investor Intelligence Assets according to the terms of the APA. (Ex. 5).

81.     Up to and including September 2021, Plaintiff continued to document and share with Defendants the numerous defects and failures associated with the Investor Intelligence Assets.

82.     Defendants have acknowledged that they have not delivered to Plaintiff all of the material Investor Intelligence Assets.

83.     In September 2021, Defendants entirely stopped cooperating with Plaintiff and failed to take any further steps to attempt to deliver the Investor Intelligence Assets.

84.     In December 2021, Plaintiff discovered that it had no longer had administrative access to Investor Intelligence and that Plaintiff's administrative access to the backend of the Investor Intelligence platform was revoked.

85.     As a result of Defendants' actions and omissions, Plaintiff has incurred significant damages, including but not limited to, the Initial Payment of $300,000, lost income, lost clients, reputational damage, in addition to other incidental and consequential damages.

### E.  DEFENDANTS' INVOLVEMENT IN COMPETING BUSINESSES

86.     Pursuant to the Restrictive Covenant, DTH is prohibited from: directly or indirectly, owning, operating, managing, or controlling any business that competes with Plaintiff or its affiliates "by assisting such Competing Business in building and/or creating a software application tool designed to connect sources of equity capital for equity capital financing projects with those parties seeking capital for a business or investment product." (Ex. 2, § 2(a)(i)).

87.     At all relevant times, including after the execution of the APA, DTH (through Mr. Dicturel and Mr. Hickman) owned, managed, operated, or controlled businesses that compete with Plaintiff.

88.     Particularly, at all relevant times, Defendants were involved in the ownership, management, operation, or control of a company named EpicAi[2]:

---

[2] https://epic.ai/ (last visited September 22, 2022).



89.    At all relevant times, EpicAi was marketed and operated as a company that develops and provides investor matchmaking tools for customers.

90.    At least through September 2020, payments made to EpicAi and Investor Intelligence were deposited into the bank account of DTH.

91.    Thus, DTH (through Mr. Dicturel and Mr. Hickman) violated the Restrictive Covenant by continuing to manage, operate, control, and assist business that are in competition with Plaintiff based on their matchmaking services to connect businesses to investors.

## F.    ALLEGATIONS IN SUPPORT OF PIERCING THE CORPORATE VEIL

92.    "[P]iercing the corporate veil . . . is not, in and of itself, an independent cause of action but a procedural device through which a plaintiff may assert facts and circumstances to persuade the court to impose the parent corporation's obligation on the subsidiary or vice versa." *SIPC v. Stratton Oakmont, Inc.*, 234 B.R. 293, 321 (S.D.N.Y. 1999).

93.     Under New York choice-of-law principles, the appropriate law to apply to the question of whether to pierce the corporate veil is the law of the state of incorporation. *Kalb, Voorhis & Co. v. American Financial Corp.*, 8 F.3d 130 (2d Cir. 1993).

94.     "[T]he doctrine of piercing the corporate veil . . . applies to limited liability companies." *Retropolis, Inc. v. 14th St. Dev. LLC*, 797 N.Y.S.2d 1, 2 (2005).

95.     DTH is registered in the state of Delaware, and therefore Delaware law applies to the question of whether the corporate veil should be pierced in this case.

96.     Under Delaware law, to state a claim for piercing the corporate veil, a party must show (1) that the company and its principals sought to be held liable operated as a single economic entity, and (2) that an overall element of injustice or unfairness is present. *Trevino v. Merscorp, Inc.*, 583 F.Supp.2d 521, 528 (D. Del. 2008) (applying DE law).

97.     Factors that courts consider when evaluating a veil-piercing include "insolvency, undercapitalization, commingling of corporate and personal funds, the absence of corporate formalities, and whether the subsidiary is simply a facade for the owner." *Manichaean Cap., LLC v. Exela Techs., Inc.*, 251 A.3d 694, 714 (Del. Ch. 2021)

98.     To prevail on an alter ego theory, there is no requirement of a showing of fraud. *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2d Cir. 1995); *see also Mobile Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 268 (D. Del. 1989) ("Fraud is frequently cited as a basis on which to pierce the corporate veil, but it is not the only one: It may be done only in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable considerations are involved.").

99.     As alleged herein, Mr. Hickman and Mr. Dicturel took improper actions through DTH by making fraudulent, intentional, and/or negligent misrepresentations to induce Plaintiff to enter into the APA.

100.    Defendants operated as a single economic entity through and as a result of Mr. Hickman's and Mr. Dicturel's exclusive control and ownership of DTH.

101.    From the execution of the APA through at least September 2021, Plaintiff's interactions with DTH in connection with Investor Intelligence were solely through Mr. Dicturel and Mr. Hickman.

102.    Further, Mr. Dicturel and Mr. Hickman commingled assets in DTH's bank account from Investor Intelligence and related companies, including EpicAi, as demonstrated by payment records provided to Plaintiff.

103.    Mr. Hickman and Mr. Dicturel failed to observe corporate formalities for DTH, further demonstrating that DTH was simply a façade for its owners.

104.    First and foremost, DTH does not maintain an independent office; its principal address is the same as Mr. Dicturel's home address. *See* Ex. 1, p.1.[3]

105.    Even more telling, Delaware corporate records for DTH show that at various times, including approximately eight months after the sale of Investor Intelligence, DTH's registration was cancelled for failure to pay taxes. A copy of DTH's publicly-available corporate records are attached hereto as **Exhibit 7**.

---

[3] The APA identifies DTH's principal address as 84 Newcomb Rd., Tenafly, NJ 07670. Publicly-available property records from New Jersey show that Mr. Dicturel has owned the property located at that address since 2014.

106.     DTH's corporate records strongly indicate that DTH failed to pay taxes not only on the prior year's operational revenue, but also on the revenue from Plaintiff's purchase of Investor Intelligence.

107.     Upon information and belief, Mr. Dicturel and Mr. Hickman used DTH as a sham entity to enter into the APA with Plaintiff without risking any personal liability for the failure to fulfill the obligations of the APA.

108.     Post-closing, DTH had no independent function or purpose.

109.     Based on Plaintiff's conversations with Mr. Dicturel post-closing, Plaintiff was led to believe that Mr. Dicturel used the proceeds from the sale of Investor Intelligence to fund a new business venture.

110.     Furthermore, despite written and verbal acknowledgement by Defendants that Plaintiff had not received what was agreed upon in the APA, Defendants have represented to Plaintiff that DTH is a defunct entity that holds no assets.

111.     "Acts intended to leave a debtor judgment proof are sufficient to show fraud and injustice." *Compagnie des Grands Hotels d'Afrique S.A. v. Starwood Cap. Gp. Glob. I LLC*, 2019 WL 148454, at *5 (D. Del. Jan. 9, 2019).

112.     In light of Plaintiff's repeated written and verbal demands to Mr. Dicturel and Mr. Hickman to deliver what was agreed upon in the APA, Mr. Dicturel and Mr. Hickman were on notice that Plaintiff might seek to recover the Initial Payment and other damages from DTH.

113.     Upon information and belief, after Plaintiff's demands and Defendant's inability to deliver pursuant to the APA, Dicturel and Mr. Hickman disbursed the Initial Payment into their personal bank accounts.

114.     In response to Plaintiff's demands to work towards a fair and just resolution, Mr. Dicturel indicated to Plaintiff that the filing of a lawsuit by Plaintiff would trigger insurance coverage from which Plaintiff might be able to recover its damages.

115.     After the commencement of this lawsuit, DTH has represented to Plaintiff that it does not have any insurance coverage, nor did it have any at any time relevant to this lawsuit.

116.     Plaintiff has been unjustly, unfairly, and inequitable harmed due to Mr. Hickman's and Mr. Dicturel's improper and wrongful use of the entity known as DTH, LLC.

117.     Holding DTH alone liable for the wrongful breaches and misrepresentations of its members, Mr. Hickman and Mr. Dicturel, would deprive Plaintiff of the ability to recover damages, thus resulting in a fundamental unfairness.

118.     In order to prevent further injustice or unfairness to Plaintiff, the circumstances of this case warrant holding Mr. Dicturel and Mr. Hickman personally liable for any and all damages awarded to Plaintiff in this action.

## G.  PLAINTIFF'S DAMAGES

119.     Plaintiff has suffered a loss of $300,000 as the Initial Payment for the Investor Intelligence Assets, which it has never received.

120.     In reliance on the promise of receiving the Investor Intelligence Assets, Plaintiff incurred $75,000 in costs for the creation of a broker-dealer business, which was dependent on Plaintiff receiving fully functioning Investor Intelligence Assets.

121.     Plaintiff also incurred $55,000 per year in costs for three consecutive years to maintain and pay the necessary FINRA costs and expenses associated with the broker-dealer business.

122.    Plaintiff has suffered significant lost profits due to the inability to generate transactions through Investor Intelligence's investor matchmaking services for its broker-dealer business.

123.    Due to Defendants' wrongful actions, Plaintiff has lost potential and existing clients, credibility, and opportunity for revenue from Investor Intelligence.

124.    Plaintiff has suffered significant reputational costs as a result of not being able to deliver to customers a fully functioning Investor Intelligence platform due to Defendants' breaches, misrepresentations, and failure to deliver the Investor Intelligence Assets.

125.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered other direct, consequential, and incidental damages.

126.    All general and statutory conditions precedent to bringing this action have been performed, have occurred, have been waived, or have otherwise been excused by Defendants' actions.

## COUNT I
## BREACH OF CONTRACT — TECHNOLOGY ASSETS PURCHASE AGREEMENT

Plaintiff sues DTH for breach of the APA and says:

127.    Plaintiff realleges, incorporates, and asserts by reference the allegations set forth in paragraphs 1-7, 16-28, 33-85, and 119-126.

128.    The APA is a valid and enforceable contract. Plaintiff and DTH intended to be bound by the APA, incorporated sufficiently definite terms into the APA, and exchanged consideration.

129.    Under the APA, DTH agreed to sell, transfer, and convey to Plaintiff the Investor Intelligence Assets.

130.     DTH also made certain representations and warranties that the Investor Intelligence Assets are fully operable, meet all applicable specifications, function in all respects, and are free of any damage or defect in design, material, or workmanship.

131.     DTH breached the covenant in Section 2.4 of the APA because DTH failed to deliver to Plaintiff all manifestations of the Assigned Properties, including but not limited to: (1) all of the assets listed in Schedule 1 to the APA; (2) the source code to the Investor Intelligence Software; (3) copies of the investor and startup CEO databases; (4) the assigned trade secrets that comprise, are comprised of, or relate to the Investor Intelligence Software or documentation; and (5) the ability to generate revenue streams from any and all of the foregoing.

132.     DTH also breached the representations and warranties in Section 3.2 of the APA because the Investor Intelligence Assets are not fully operable, do not meet all applicable specifications, and do not function in all respects.

133.     DTH also breached the representations and warranties in Section 3.2 of the APA because the documentation in connection with the Investor Intelligence Assets, to the extent it was provided, is inaccurate because the Investor Intelligence Assets contain material undocumented features.

134.     DTH has also breached the representations and warranties in Section 3.2 of the APA because the Investor Intelligence software media is damaged or defective in design, material, or workmanship.

135.     As a direct and proximate result of DTH's breaches of the APA and representations, warranties, agreements, and covenants therein, Plaintiff has suffered direct and consequential damages in an amount to be determined at trial.

136.     Plaintiff complied in all material respects with its obligations under the APA.

137. Plaintiff has retained the law firm of Quarles & Brady LLP and agreed to pay reasonable fees for its services.

138. Under Section 8.6 of the APA, Plaintiff is entitled to recover from DTH all reasonable attorneys' fees and costs incurred in connection with DTH's breach of the APA.

WHEREFORE, Plaintiff demands judgment against Defendant DTH, LLC for compensatory damages, prejudgment interest, attorneys' fees, and costs, and all other remedies available at law.

<u>COUNT II</u>
**BREACH OF EXPRESS WARRANTY**

Plaintiff sues DTH for breach of the express warranty and says:

139. Plaintiff realleges, incorporates, and asserts by reference the allegations set forth in paragraphs 1-7, 16-28, 33-85, and 119-126.

140. Plaintiff and DTH entered into the APA, which is a binding and enforceable agreement.

141. Section 3.2(a) of the APA expressly warrants that the Investor Intelligence Software is fully operable, meets all applicable specifications, and functions in all respects, in conformity with the documentation contemplated by the APA.

142. Section 3.2(b) of the APA expressly warrants that the documentation related to the Investor Intelligence Assets is accurate in all respects such that the Investor Intelligence software does not have any material undocumented feature.

143. Section 3.2(c) of the APA warrants that the media on which the Investor Intelligence software and related documentation is delivered to Plaintiff are free of any damage or defect in design, material, or workmanship, and will remain so under ordinary use as contemplated by the APA.

144. DTH breached these express warranties because the Investor Intelligence Assets that were delivered to Plaintiff were, and continue to be, materially defective and fail to provide many of the functionalities and capabilities contemplated by the APA.

145. As a direct and proximate result of DTH's breach, Plaintiff has suffered direct and consequential damages in an amount to be determined at trial.

WHEREFORE, Plaintiff demands judgment against Defendant DTH, LLC for compensatory damages, prejudgment interest, attorneys' fees, and costs, and all other remedies available at law.

## COUNT III
## BREACH OF CONTRACT — RESTRICTIVE COVENANT AGREEMENT

Plaintiff sues DTH for breach of the Restrictive Covenant Agreement and says:

146. Plaintiff realleges, incorporates, and asserts by reference the allegations set forth in paragraphs 1-7, 29-32, 42-51, 86-91, 119-126.

147. The Restrictive Covenant is a valid and enforceable contract between Plaintiff and DTH.

148. The parties intended to be bound by the Restrictive Covenant, incorporated sufficiently definite terms into the Restrictive Covenant, and exchanged consideration.

149. Upon information and belief, DTH breached the Restrictive Covenant by directly or indirectly owning, operating, managing, or controlling one or more businesses that competes with Plaintiff or its affiliates by assisting such competing businesses in building and/or creating a software application tool designed to connect sources of equity capital for equity capital financing projects with those parties seeking capital for a business or investment product.

150. Upon information and belief, at all material times, Defendants owned, operated, managed, or controlled Epic Ai, and possibly other businesses, which are competing businesses

designed to connect sources of equity capital for equity capital financing projects with those parties seeking capital for a business or investment product.

151.     Furthermore, the Investor Intelligence website that DTH delivered to Plaintiff contained links that directed visitors to other businesses owned, operated, or controlled by DTH.

152.     As a direct and proximate result of DTH's breaches, Plaintiff has suffered direct and consequential damages in an amount to be determined at trial.

WHEREFORE, Plaintiff demands judgment against Defendant DTH, LLC, for compensatory damages, prejudgment interest, attorneys' fees, and costs, and all other remedies available at law.

## COUNT IV
## NEGLIGENT MISREPRESENTATION

Plaintiff sues Mr. Dicturel and Mr. Hickman, jointly and severally, for negligent misrepresentation and says:

153.     Plaintiff realleges, incorporates, and asserts by reference the allegations set forth in paragraphs 1-16, 22, 28, 33-85, and 92-126.

154.     "To state a claim for negligent misrepresentation under New York law, the plaintiff must allege that '(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.'" *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 114 (2d Cir. 2012) (quoting *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir.2000)).

155. "In determining whether justifiable reliance exists in a particular case, a fact finder should consider whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Kimmell v. Schaefer*, 89 N.Y.2d 257, 264 (1996)

156. Plaintiff stood in a special relationship with Mr. Dicturel and Mr. Hickman by virtue of their roles as creators and developers of Investor Intelligence, and their obligation to provide transition services with respect to the Investor Intelligence Assets.

157. Mr. Dicturel and Mr. Hickman possessed special knowledge regarding the Investor Intelligence Assets and their ability to deliver same to Plaintiff that were not known to Plaintiff.

158. Particularly, Mr. Dicturel and Mr. Hickman knew that they were not transferring to Plaintiff the Investor Intelligence Assets as they existed when they demonstrated the platform to Plaintiff to induce its purchase.

159. Mr. Dicturel and Mr. Hickman further knew that they were instead planning to deliver to Plaintiff a version of the Investor Intelligence Assets that Mr. Hickman was attempting to re-engineer based on a platform that belonged to another entity.

160. Mr. Dicturel and Mr. Hickman knew that Plaintiff would reasonably rely on their representations regarding the Investor Intelligence Assets in entering into the APA.

161. Mr. Dicturel and Mr. Hickman negligently failed to provide correct, or negligently provided incorrect and misleading information regarding the Investor Intelligence Assets, upon which Plaintiff relied.

162. Post-closing, Mr. Dicturel and Mr. Hickman made numerous representations that they will repair the Investor Intelligence Assets and deliver to Plaintiff what was purchased under

the APA. *See, e.g.,* Ex. 4 (Mr. Hickman's email assuring Plaintiff that the "deliverables" will be provided, five months after the APA was executed).

163.     Mr. Dicturel and Mr. Hickman had duties to give Plaintiff correct information as the creators, developers, providers of transition services for Investor Intelligence, and the only individuals with the requisite knowledge of and access to the Investor Intelligence backend, source code, and other technical features.

164.     Mr. Dicturel and Mr. Hickman should have known that those representations were false, particularly given that they promised to deliver various assets and capabilities within one week of executing the APA, but were unable to deliver pursuant to the APA even one year later.

165.     Based on Plaintiff's reasonable reliance on Mr. Dicturel's and Mr. Hickman's representations that they were working to repair the Investor Intelligence Assets, Plaintiff lost opportunities to pursue other sources of income.

166.     As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiff has suffered damages in an amount to be determined at trial.

WHEREFORE, Plaintiff demands judgment against Defendants Tomer Dicturel and Ryan Hickman, jointly and severally, for Plaintiff's actual damages, prejudgment interest, attorneys' fees, and costs, and all other remedies available at law.

## COUNT V
## FRAUDULENT INDUCEMENT

Plaintiff sues Mr. Dicturel and Mr. Hickman, jointly and severally, for fraudulent inducement and says:

167.     Plaintiff realleges, incorporates, and asserts by reference the allegations set forth in paragraphs 1-16, 22, 28, 33-85, 92-126.

168. Early in the negotiation process, Mr. Dicturel and Mr. Hickman were aware that Plaintiff's purposes for purchasing the Investor Intelligence Assets were to: (1) provide matchmaking services to investors and businesses through the Investor Intelligence platform; (2) purchase the existing Investor Intelligence Assets that had established revenue streams; and (3) use the Investor Intelligence platform to support Plaintiff's broker-dealer business.

169. Delivery of the fully functioning Investor Intelligence Assets was a basic assumption of the APA.

170. The statements made to Plaintiff by Mr. Dicturel and Mr. Hickman, which are incorporated herein, were fraudulent and misleading because Plaintiff never received, *inter alia*: (i) artificial intelligence and natural language programming to read and contextualize investors' biographies for matchmaking and recommendations; (ii) the ability to receive recommendations based on regression analysis of emails; (iii) the ability to receive recommendations based on recording behaviors of opens or "clicks" on a particular deal or send time optimization for emails; or (iv) the ability to curate lists of email recipients—*i.e.,* multi-tenant functionality.

171. Furthermore, Mr. Dicturel and Mr. Hickman knowingly made false representations by presenting to Plaintiff a different version of Investor Intelligence that belonged to a different entity, and then actually delivered what was a failed attempt at re-engineering the existing platform.

172. Mr. Dicturel and Mr. Hickman possessed the material knowledge that they would not be able to deliver to Plaintiff the Investor Intelligence Assets as contemplated by the APA because they knew they would not be delivering to Plaintiff the existing platform.

173. Mr. Dicturel and Mr. Hickman purposefully withheld that material information from Plaintiff to induce Plaintiff into purchasing the Investor Intelligence Assets.

174.     Mr. Dicturel and Mr. Hickman made material representations to Plaintiff as to the Investor Intelligence Assets, as well as to their ability to deliver the Investor Intelligence Assets as contemplated by the APA.

175.     Mr. Dicturel and Mr. Hickman also represented that they would continue to provide support to Plaintiff to affect the transfer of the Investor Intelligence Assets to Plaintiff, including by assuring Plaintiff that someone other than Mr. Dicturel or Mr. Hickman could understand and repair the source code, and that Defendants would provide the deliverables contemplated by the APA.

176.     At all times hereinafter mentioned, Mr. Dicturel's and Mr. Hickman's representations were false.

177.     Mr. Dicturel and Mr. Hickman made such misrepresentations with the knowledge that they were false  with the specific intent of defrauding Plaintiff, inducing Plaintiff to purchase the Investor Intelligence Assets, and depriving Plaintiff of the benefit of its bargain.

178.     Plaintiff justifiably relied on the misrepresentations and omissions made by Mr. Hickman and Mr. Dicturel.

179.     Plaintiff would not have entered into the APA had it known that such representations were false.

180.     Plaintiff has been damaged as a direct result of Mr. Dicturel's and Mr. Hickman's fraudulent misrepresentations in an amount to be determined at trial.

181.     Plaintiff's damages are a direct and foreseeable consequence of the Mr. Dicturel's and Mr. Hickman's fraudulent acts.

182.     Punitive damages must be added to any award of compensatory damages as a result of the willful and wanton nature of Mr. Dicturel's and Mr. Hickman's actions.

WHEREFORE, Plaintiff demands judgment against Defendants Tomer Dicturel and Ryan Hickman, jointly and severally, for Plaintiff's actual damages, prejudgment interest, attorneys' fees, and costs, punitive damages, and all other remedies available at law.

## COUNT VI
## UNJUST ENRICHMENT

Plaintiff sues Mr. Dicturel and Mr. Hickman for unjust enrichment and says:

183.    Plaintiff realleges, incorporates, and asserts by reference the allegations set forth in paragraphs 1-16, 22, 28, 33-85, 92-126.

184.    Plaintiff was obligated to incur significant expenses, including but not limited to the $300,000 Initial Payment and the payment of operating costs for over one year, under the false pretense that it would receive the Investor Intelligence Assets and existing revenue streams.

185.    Mr. Dicturel and Mr. Hickman have knowingly and willingly been enriched at Plaintiff's expense, and Plaintiff has not received anything of value in return.

186.    Principles of equity require restitution by Mr. Dicturel and Mr. Hickman to Plaintiff.

187.    It is against equity and good conscience to permit Mr. Dicturel and Mr. Hickman to retain the benefits paid by Plaintiff where Plaintiff has not received what it paid for.

WHEREFORE, Plaintiff demands judgment against Defendants Ryan Hickman and Tomer Dicturel, jointly and severally, for Plaintiff's actual damages, prejudgment interest, attorneys' fees, and costs, and all other remedies available at law.

## COUNT VII
## PROMISSORY ESTOPPEL

Plaintiff sues Mr. Dicturel and Mr. Hickman for promissory estoppel, jointly and severally, and says:

188. Plaintiff realleges, incorporates, and asserts by reference the allegations set forth in paragraphs 1-16, 22, 28, 33-85, 92-126.

189. Mr. Dicturel and Mr. Hickman made clear and unambiguous promises to Plaintiff that it would deliver certain assets, functionalities, and capabilities in connection with Plaintiff's purchase of Investor Intelligence, including in July and October 2020 before the execution of the APA.

190. Additionally, on or about March 31, 2021, Mr. Hickman made a clear and unambiguous promise "to provide the specifics per the list of deliverables" contemplated by the APA. (Ex. 5).

191. Plaintiff reasonably and foreseeably relied upon such promises to its detriment, including by entering into the APA and awaiting delivery of the Investor Intelligence Assets for over one year.

192. As a direct and proximate result of Mr. Dicturel's and Mr. Hickman's promises and Plaintiff's reasonable and foreseeable reliance on those promises, Plaintiff suffered damages in an amount to be determined at trial.

WHEREFORE, Plaintiff demands judgment against Defendants Ryan Hickman and Tomer Dicturel, jointly and severally, for Plaintiff's actual damages, prejudgment interest, attorneys' fees, and costs, and all other remedies available at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

a) A finding that Plaintiff has pled sufficient facts to pierce the corporate veil of Defendant DTH, LLC and to bring claims against Defendants Tomer Dicturel and Ryan Hickman;

b) On each and every cause of action judgment for compensatory damages in an amount to be determined at trial;

c)  On each and every cause of action for which punitive damages are recoverable and warranted, judgment for punitive damages in an amount to be determined at trial;

d)  Rescission of the APA;

e)  Indemnification by Defendants of all damages incurred by Plaintiff, including but not limited to, operating costs;

f)  Such other and further relief as may be just, proper, and equitable, including interest, costs, and attorneys' fees.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Dated this 22nd day of September, 2022

QUARLES & BRADY LLP

By: /s/ *Gabriela N. Timis*
    Joseph T. Kohn, Esq.
    SBN 5001136
    Gabriela N. Timis, Esq.
    (*Admitted Pro Hac*)
    1395 Panther Lane, Suite 300
    Naples, FL 34109
    Tel.: (239) 659-5028
    Fax: (239) 213-5426
    joseph.kohn@quarles.com
    gabriela.timis@quarles.com
    debra.topping@quarles.com
    kerlyne.luc@quarles.com
    docketfl@quarles.com

        *and*

    John R. Remington
    (*Admitted Pro Hac*)
    411 East Wisconsin Avenue, Suite 2400
    Milwaukee, Wisconsin 53202
    Tel.: (414) 277-3087
    Fax: (414) 978-8897
    john.remington@quarles.com
    *Attorneys for Plaintiff*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing Complaint was served upon

the following counsel of record via ECF on the 22nd day of September 2022:

Steven S. Fitzgerald, Esq.
Wollmuth Maher & Deutsch LLP
500 Fifth Avenue
New York, NY 10110
sfitzgerald@wmd-law.com
*Counsel for Defendant DTH, LLC*

/s/ *Gabriela N. Timis*
Attorney